IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| CUSTOMERS BANK, | HONORABLE JEROME B. SIMANDLE |
| Plaintiff, | |
| v. | Civil Action No. 12-cv-5878 (JBS/KMW) |
| HARVEST COMMUNITY BANK, | **OPINION** |
| Defendant. | |

APPEARANCES:

Scott Jonathan Good, Esq.
Bergmann & Good, LLC
76 East Euclid Ave., Suite 101
Haddonfield, NJ 08033
      Attorney for Plaintiff

Benjamin David Morgan, Esq.
Archer & Greiner PC
One Centennial Square
Haddonfield, NJ 08033
      Attorney for Defendant

**SIMANDLE, Chief Judge:**

I.    **INTRODUCTION**

Plaintiff, Customers Bank ("Customers"), filed this action alleging breach of contract by Defendant, Harvest Community Bank ("Harvest"). In 2007, Harvest executed a Loan with Snug Harbor, LLC ("Snug"). Berkshire Bank ("Berkshire") then bought a "participation share" in the Snug Loan pursuant to a Participation Agreement ("Agreement") with Harvest. Customers

subsequently purchased Berkshire and Berkshire's rights to the Snug Loan. Customers alleges Harvest has failed to manage the Snug Loan in a prudent manner as required by the Participation Agreement causing excess loss to Customers on the nonperforming or underperforming Snug Loan.

Customers filed a motion for summary judgment and Harvest filed a cross-motion for summary judgment. [Docket Items 16 & 19.] The Court heard oral argument on August 6, 2014. The Court will deny Harvest's motion. The Court will partially grant Customers' motion, holding that Harvest owes Customers an unspecified amount of unpaid principal and that Harvest did not perform certain enumerated obligations under the Agreement. The Court will deny Customers' motion for damages because Customers has not shown, as a matter of law, that it is entitled to damages from Harvest's breaches.

**II.   BACKGROUND**

   **A.      Facts**

       **1. Harvest's Loan to Snug**

On November 16, 2007, Harvest executed a promissory note with Snug in which Harvest agreed to loan Snug $1,895,000.00. (Pl. Ex. B to Napierkowski Aff., Promissory Note ("First Note") at 1, Nov. 16, 2007.) The First Note stipulates that Snug will pay Harvest both principal and interest every month. (Id. at 1.) It also stipulates that there will be a five percent late charge

for any payment not received within 15 days of its due date.
(Id. at 2.)

The First Note specifies that, in the event of default, a
default rate of interest begins to accrue adding 2.5 percent to
the rate of interest that was otherwise payable. (Id. at 4.) The
First Note defines a default event as "default in the payment of
any amount due . . . and the continuance of such default for . .
. 30 days"; "levy of any writ, warrant, attachment, execution or
similar process against any property of [Snug]"; or "any
federal, state or local tax lien to any property of [Snug]."
(Id. at 3.)

The First Note provides that "[Harvest] shall have the
right, at all times, to enforce the provisions of this Note and
the other Loan Documents in strict accordance with their terms."
(Id. at 4.) Failure to enforce does not waive this enforcement
right: "The failure or delay of [Harvest] . . . to enforce its
rights under such provisions . . . shall not be construed as
having created a custom in any way or manner contrary to the
specific provisions of this Note . . . or as having in any way
or manner modified or waived the same." (Id.)

Harvest and Snug also executed a mortgage agreement. The
mortgage agreement stipulates that Snug will be in default if,
without Harvest's written consent, it incurs "any debt, judgment
or other obligation . . . upon all or any part of the Mortgaged

3

Property . . .” (Pl. Ex. B to Napierkowsi Aff., Mortgage at 7,
Nov. 16, 2007.) The mortgage also mandates that the “mortgager
shall pay when due and payable and before interest or penalties
are due thereon, all taxes, assessments, water and sewer rents
and all other charges . . . .” (<u>Id.</u> at 4.)[1]

### 2. Participation Agreement Between Harvest and Customers

On December 17, 2007, Harvest sold a 41.4 percent
participation interest in Snug’s loan to Berkshire Bank. (Pl.
Ex. A to Napierkowski Aff., Participation Agreement at 1, Dec.
17, 2007.) Berkshire’s “participation share” was worth
$785,188.00. (<u>Id.</u>)

The Agreement stipulates that Berkshire’s participation is
on a “last in, first out” basis, meaning that the “entire
principal balance of [Berkshire]’s share shall be repaid before
any principal reduction to [Harvest]’s portion.” (<u>Id.</u> at 1-2.)
The agreement further stipulates that the “respective interest
of [Harvest] and [Berkshire] shall. . . be equal in lien and
neither party shall have priority over the other.” (<u>Id.</u> at 2.)

According to the Agreement, “[e]xcept as set forth in the
next sentence, [Harvest] shall have the sole and exclusive right
to service, administer and monitor the loan, including without
limitation, the right to exercise all rights, privileges and

---

[1] The First Note and the mortgage agreement, collectively, are
the “Loan Documents.”

4

options under the Loan Documents, including the waiver of non-performance by [Snug] . . . other than a waiver of any term or condition which materially and adversely affects [Berkshire]." (Id.) The "next sentence" states that "[Harvest] covenants and agrees that except upon prior written consent of [Berkshire], which consent shall not unreasonably be withheld, [Harvest] shall not (a) make any advances to [Snug]; (b) amend the Loan Documents or extend, modify or terminate the Loan; . . . (d) waive non-performance by [Snug] . . . of any term or condition which materially and adversely affects [Berkshire]; (e) enforce or refrain from enforcing its rights or remedies under the Loan Documents; . . . (h) consent to any reduction in the interest rate or in any fees payable to [Berkshire] on its participation share; . . . or (j) extend any date for or waive any failure to make payment." (Id. at 2-3.)

In addition, the Agreement states that "[Harvest] shall exercise the same care in accordance with its usual practices in administering, servicing and monitoring the Loan as it exercises with respect to similar transactions . . . ." (Id. at 4.) This "usual practices" clause is key to understanding Harvest's obligations and duties to Customers Bank.

Harvest and Berkshire agreed that "[Harvest] will immediately notify [Berkshire] when it receives notice or has knowledge of any default or any material event of default under

5

the Loan Documents." (Id. at 3-4.) The Loan also stipulates that "[Harvest] will furnish [Berkshire] with copies of all financial statements and field examination reports of [Snug] and such financial statements and reports as [Berkshire] may reasonably request." (Id. at 3.)

Harvest and Berkshire agreed that "[Harvest] makes no representations or warranty and assumes no responsibility with respect to the financial condition of [Snug]. . . [Harvest] assumes no responsibility or liability with respect to the collectibility of the Loan or the performance by [Snug] of any obligation under the Loan Documents." (Id.) The Agreement further specifies that "the participation herein described is a full-risk participation and [Berkshire] shall look only to payments received and collected by [Harvest] from [Snug] . . . for repayment of the Participation Share." (Id. at 4.)

Finally, the Agreement "shall be governed by the laws of the State of New Jersey, shall not be modified, cancelled or terminated except by an instrument in writing signed by the parties hereto, and shall inure to the benefit of and binding upon the parties hereto and their respective successors and assigns." (Id. at 5.)

In 2011 Customers Bank purchased Berkshire's assets, including its interest, as outlined in the Participation

Agreement, in Harvest's Loan to Snug. (Statement of Undisputed Material Facts ("SMF") [Docket Item 16] ¶ 4.)

### 3. Snug's Delinquent Performance Under the Loan

Snug Harbor was habitually late in making its payments, including multiple occasions when it was more than 30 days late and some occasions when it was more than 60 days late. [Docket Item 16-6 at 6-12]; (Pl. Ex. C to Garubo Cert., Matthews Dep. 70:12-20, Sept. 11, 2013).

As of September of 2013, Snug had not made a principal payment since September of 2012. [Docket Item 16-6 at 6.] Since that date, Harvest applied all payments only to the interest portion of the Loan and nothing toward the principal. [Id.] Linda Matthews, Harvest's Chief Loan Officer, explained that Harvest applied Snug's payments to interest first because Snug was late in its payments. (Matthews Dep. 27:18-28: 8.)

In addition, as of February of 2011, Snug owed $212,538.42 in income taxes to the State of New Jersey. [Docket Item 16-8 at 4.] Customers conducted a tax search of the property on March 7, 2014. (White Aff. ¶ 6, Mar. 12, 2014.) The search indicated that Snug owes $25,140.26 in real estate taxes for 2013 and $14,219.57 for 2014. (Pl. Ex. A. to White Aff., Mar. 7, 2014.)

Customers also produced a judgment search showing numerous judgments entered against Snug. (Pl. Ex. F to Napierkowski Aff., Oct. 2, 2012.) Harvest did not report these judgments to

7

Customers, (SMF ¶ 23), although the record is unclear as to whether Harvest knew of them.

The State of New Jersey placed a levy on Snug's bank account. (Matthews Dep. 78:13-19.) Matthews stated that the State eventually removed the hold and Harvest never turned over any of Snug's funds. (Id. 78:16-21; 78:25-79:5.)

In addition, a $57,834.43 construction lien was placed on the property on August 26, 2010. (Matthews Dep. 86:21-87:2); [Docket Item 16-9 at 18]. When asked if that lien was ever "removed or satisfied," Mathews stated "I do not recall." (Id. at 87:24-8:1.)

### 4. Harvest's Administration of the Loan

Harvest loaned Snug an additional $575,000, which Snug used to pay a portion of its outstanding income taxes. (Ex. L to Napierkowski Aff., October 6, 2011; Matthews Dep. 64:23-65:12.) When asked if Harvest notified Customers of this second loan, Matthews stated "not that I know of." (Matthews Dep. 101:13-16.) When asked if Harvest informed Customers that Snug had tax delinquencies in excess of $200,000, Matthews again responded "to my knowledge, no." (Id. 108:9-16.)

In terms of late fees, Matthews stated that Harvest billed late fees to Snug but late charges "still need to be paid." (Id. 72:5-13.) When asked to clarify how many late charges were unpaid, Matthews did not know. (Id. 72:5-15.)

8

Matthews also stated she was not aware that there were tax liens and delinquent real estate taxes on the property. (Id. 90:17-20.) She further stated that "Harvest policy is that taxes are to be paid annually," and that Harvest typically has "not required receipts." (Id. 92:16-19.) She specified: "We have a number of customers who pay their taxes at the end of the year. They do not pay them quarterly." (Id. 92:21-24.)

According to Matthews, Harvest gave Snug a three-month payment waiver for Harvest's portion of the Loan because of Hurricane Sandy. (Id. 35:11-36:8.) Matthews further explained that Snug still owed all outstanding interest and principal, but that the due date was changed to reflect a three-month waiver. (Id. 36:2-8.) When asked if Harvest ever asked Customers for consent to waive a portion of the payment, Matthews responded, "no, because we were waiving our portion, not theirs." (Id. 35:23-36:1.) When asked if Harvest extended the Loan or if there was ever a written modification of the Loan, Matthews responded, "no." (Id. 36:9-15.) Thus, under this "waiver," Harvest extended the due date of the Loan for three months without notice to Customers as required by the Participation Agreement.

Matthews acknowledged that Harvest never charged Snug the default rate of interest. (Id. 73:3-6.) She explained that Harvest had never, to her knowledge, charged any customer the default rate of interest. (Id. 73:7-15.)

When asked if Harvest had ever sent a written notice of default to Snug, Matthews responded "no, not that I know of." (Id. 80:12-14.) When asked if Harvest had ever taken any steps to accelerate the balance owed under the Loan, Matthews responded, "not that I know of." (Id. 80: 15-17.)

Since the Participation Agreement requires Harvest to "exercise the same care in accordance with its usual practices . . . as it exercises with respect to similar transactions" with its own customers, there was discovery as to what Harvest's usual practices are when it administers its own loan portfolio. When asked if Harvest had a policy regarding how long it waits to receive principal reduction payments before calling a loan into default, Matthews stated "as long as we are receiving a payment of some sort, we won't call it in default." (Id. 55:1-6.) Matthews further specified, "if we can work with a customer and continue to receive something monthly, then we will work with them until their default is cured." (Id. 55:19-22.) She explained that Harvest makes "every attempt to work things out" and that "we think it's in our best interest to work with our customers." (Id. 58:22-25.)

Dennis Engle, President of Harvest, also emphasized this policy: "We're a community bank and we work with our customers. . . . As long as that customer cooperates with us, we will work

with that customer and try to find out ways to work things out."
(Def. Ex. B, Engle Dep. 33:18-23, Sept. 13, 2013.)

When asked if Harvest's "actions in their servicing,
monitoring, or administering" the Loan "differed in any way from
any other loan that Harvest has done," she responded "No, it
hasn't." (Matthews Dep. 194:9-15.) Further, when asked if
Harvest had done "anything with the loan that would be
considered unreasonable," she responded "no." (Id. 194:16-19.)
When asked "if [Harvest] had informed Customers of . . . any
changes or modifications or alterations [Harvest] w[as] going to
do with the loan . . ., do you think they would have any
reasonable basis for objecting to those actions," Matthews
responded "[n]o." (Id. 194:25-195:5.)

When asked whether Berkshire "provide[d] [Harvest] with any
complaints or voice[d] any kind of concerns about what Harvest
was doing in terms of the Snug Harbor loan," Matthews said,
"[n]ot at all." (Id. 194:20-24.) Richard Napierkowski,
Customers' Senior Vice President, testified that, in his review
of Snug's file, he did not see anything indicating that
Berkshire had any problems with the Snug Loan. (Def. Ex. C,
Napierkowski Dep. 21:16-22.)

### 5. Customers' Attempts to Obtain Updates from Harvest

On July 25, 2012, a representative of Customers emailed
Harvest requesting an update on Snug's payments for June 16 and

July 16. [Docket Item 16-11 at 2.] Customers sent a second email
the same day requesting Snug's financial information. [Id.]
Customers emailed Harvest on July 31, 2012 stating that
Customers "will no longer tolerate [Snug's] ongoing deficiency"
and asking Harvest to "initiate immediate corrective action."
[Id. at 3.] Customers warned that, if Harvest did not take
immediate action, Customers would "take the lead and move
accordingly." [Id.] Customers emailed Harvest on August 7, 2012
about Snug's financial status and requested a remediation plan.
[Id. at 4.] Finally, on August 20, 2012, Customers demanded
Harvest provide within three days, inter alia, a "[c]opy of
default letter issued to Snug Harbor by Harvest" and a "[c]opy
of resolution plan provided by Borrower to Harvest outlining the
immediate/long term resolution of the payment default . . . ."
[Docket Item 16-12 at 2.][2]

### 6. Customers' Damages

#### a. Principal Payments Owed to Customers

At oral argument, Harvest acknowledged that it owed
Customers unpaid principal and consented to partial summary
judgment recognizing that obligation. The parties agreed to
determine, between themselves, the precise amount of unpaid

---

[2] These emails appear to be part of an email chain between
Customers and Harvest. Neither Customers nor Harvest provided
Harvest's responses, if any, to these emails.

principal owed.[3] The Court will therefore enter partial summary judgment for Customers, holding that Harvest owes Customers an unspecified amount of unpaid principal. The parties shall promptly determine the specific amount and submit a form of judgment or a stipulation that Harvest has satisfied the amount due.

This Opinion will not address the unpaid principal issue further.

### b. General Damages

Customers claims that Harvest owes the outstanding balance of Customers' participation share, which is $733,919.07. Napierkowski, Customers' Senior Vice President, explained that number is "the outstanding balance of our share of the loan that we had requested that they buy it back." (Napierkowski Dep. 68:23-25.) When asked whether Harvest has an obligation to buy back or repay Customers' share, Napierkowski stated, "Harvest has no obligation." (Id. 69:1-10.) When asked whether it was "possible that Harvest could have done everything that Customers wanted and Customers wouldn't have gotten back its full position," Napierkowski said "[t]hat's a possibility." (Id. 76:16-19.)

---

[3] Both counsel indicated their belief that this obligation was $78,026.00 less any amounts paid down since the time that sum was figured. Their clients are reviewing the account to determine the exact current sum.

Napierkowski testified that Customers' "balance may be impaired. We don't know . . . ." (Id. 70:5-6.) When asked "is it just as possible that your balance isn't impaired," Napierkowski responded "[s]ure." (Id. 70:7-9.) He acknowledged that he had no facts or documents to show that the collateral has devalued such that Customers cannot receive full compensation for its share. (Id. 73:12-16.) He also acknowledged that Customers has not had to pay penalties, fines, or other costs resulting from Snug's failure to make payments. (Id. 73:17-21.)

**B. Plaintiff's Complaint**

Customers filed this action against Harvest for breach of contract. Customers claims that as a result of the breach, it suffered damages of $733,919.07[4] in principal plus $13,144.48 in interest through September 5, 2012, which represents the unpaid balance on Customers' participation share. (Compl. at 7 [Docket Item 1].)

The Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332.

**C. Parties' Arguments**

**1. Customers' Motion for Summary Judgment**

Customers filed a motion for summary judgment [Docket Item 16] arguing that Harvest breached the Agreement because Harvest failed to provide documents and information to Customers about

---

[4] According to Customers, as of October 16, 2013, the outstanding principal balance was $725,469.44.

Snug's various events of default, including judgments, liens, and levies against Snug. In addition, Customers asserts that Harvest breached because it did not obtain Customers' consent before making advances to Snug, amending the Loan Documents, refraining from enforcing remedies, and waiving Snug's non-performance. Finally, Customers claims that Harvest failed to comport with industry standards for managing the Snug Loan.[5]

### 2. Harvest's Opposition and Cross-Motion

Harvest filed a combined opposition and cross-motion for summary judgment [Docket Item 20], arguing that there was no breach because the Agreement states that Harvest has the "sole and exclusive right to service, administer, and monitor the Loan." (Def. Cross-Mot. at 3.) Harvest also emphasizes the clause stating that Harvest "shall exercise the same care in accordance with its usual practices in administering, servicing and monitoring the Loan as it exercises with respect to similar transactions . . . ." (Id.) Harvest argues that choosing to

---

[5] At oral argument, Customers introduced new arguments, claiming that Harvest violated federal regulations and Generally Accepted Accounting Principles ("GAAP"). Customers did not identify the specific regulations and GAAP principles that Harvest allegedly violated, and it did not give Defendant any notice of these new arguments. The Court will not address them. A "newly minted argument raised for the first time during oral argument" is "problematic." Millipore Corp. v. W.L. Gore & Associates, Inc., Civ. 11-1453 (ES), 2011 WL 5513193, at *9 (D.N.J. Nov. 9, 2011). "[A]rguments raised for the first time at oral argument will be disregarded." Id.

accommodate Snug, instead of calling the Loan, is consistent with how it administers and services its other loans.

While Harvest concedes that the Agreement "does state written consent by [Customers] is required for certain actions to be taken," Harvest notes that consent "shall not be unreasonably withheld." (Id. at 4.) Harvest argues that Customers' "written consent is merely a formality," unless Harvest's actions are unreasonable, and none of them were unreasonable. (Id.)

Furthermore, Harvest argues that Customers is not entitled to damages because Harvest never guaranteed the Loan or Snug's ability to perform and because the Agreement states that Customers cannot look to Harvest for any monies that have not been collected from Snug.

III.     **STANDARD OF REVIEW**

Summary judgment is appropriate when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). All inferences should be drawn in favor of the non-moving party. Id. at 255.

"The standard by which the court decides a summary judgment motion does not change when the parties file cross-motions." United States v. Kramer, 644 F.Supp.2d 479, 488 (D.N.J. 2008). "When ruling on cross-motions for summary judgment, the court must consider the motions independently and view the evidence on each motion in the light most favorable to the party opposing the motion." Id. (citation omitted).

## IV.   DISCUSSION

### A. Choice of Law

#### 1. New Jersey Law Applies

The Agreement specifies that it "shall be governed by the laws of the State of New Jersey . . . ." (Agreement at 5.) In applying New Jersey law, the Court will "principally rely[] on opinions of the Supreme Court of New Jersey by which we are bound with respect to questions of New Jersey law." Elliott & Frantz, Inc. v. Ingersoll-Rand Co., 457 F.3d 312, 318-319 (3d Cir. 2006) (citation omitted). "When the state's highest court has not addressed the issue, the federal court must predict its holding." Borman v. Raymark Industries, Inc., 960 F.2d 327, 331 (3d Cir. 1992). In that situation, decisions from the New Jersey Superior Court Appellate Division are persuasive: "Where an intermediate appellate state court rests its considered judgment upon the rule of law which it announces, that is a datum for ascertaining state law which is not to be disregarded by a

17

federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." Budget Rent-A-Car Sys., Inc. v. Chappell, 407 F.3d 166, 174 (3d Cir. 2005) (quotation omitted).

### 2. Federal Contract Law Does Not Apply

In their briefs, both Customers and Harvest cite Pittsburgh National Bank v. Abdnor, 898 F.2d 334 (3d Cir. 1990), which is inapplicable. Abdnor was a breach of contract case involving the Small Business Administration ("SBA") and, in that case, the dispositive issue was "a question of federal law." Id. at 338. Federal contract law governed in Abdnor because the SBA, a federal government agency, was a party to the contract at issue. See U.S. v. Kimbell Foods, 440 U.S. 715, 726 (U.S. 1979) ("federal law governs questions involving the rights of the United States arising under nationwide federal programs"). In the present case, by contrast, no federal agency is a party and the Agreement specifies that New Jersey law governs.

### B. New Jersey Breach of Contract Law

Under New Jersey Law, to establish a breach of contract claim, "a plaintiff has the burden to show that the parties entered into a valid contract, that the defendant failed to perform his obligations under the contract and that the plaintiff sustained damages as a result." Murphy v. Implicito, 392 N.J. Super. 245, 265 (N.J. Super. Ct. App. Div. 2007); see

also Sheet Metal Workers Int'l Ass'n Local Union No. 27, AFL-CIO
v. E.P. Donnelly, Inc., 737 F.3d 879, 900 (3d Cir. 2013) ("To
prevail on a breach of contract claim under New Jersey law, a
plaintiff must establish three elements: (1) the existence of a
valid contract between the parties; (2) failure of the defendant
to perform its obligations under the contract; and (3) a causal
relationship between the breach and the plaintiff's alleged
damages.").

Neither party disputes the validity of the Agreement.
Therefore, the primary issues are whether Harvest failed to
perform its obligations and whether Customers sustained damages
as a result.

**C. Whether Harvest Performed Its Obligations**

**1. Failure to Obtain Consent and Notify of Defaults**

Customers argues that Harvest breached the Agreement by not
obtaining Customers' consent before taking certain actions in
regards to the Loan, by not informing Customers when Harvest
became aware of various default events, and by not supplying
Customers with information and documentation required under the
Agreement. Customers points to the clause of the Agreement
stating: Harvest "agrees that except upon prior written consent
of [Customers]," Harvest "shall not" make any advances to Snug,
amend the Loan Documents, or waive non-performance by Snug.
(Agreement at 2-3.) Further, Customers also points to the clause

stating that "[Harvest] will immediately notify [Customers] when it receives notice or has knowledge of any default." (Agreement at 3-4.)

In response, Harvest emphasizes that it has the "sole and exclusive right to service, administer, and monitor the Loan," and that Harvest "shall exercise the same care in accordance with its usual practices in administering, servicing and monitoring the Loan as it exercises with respect to similar transactions . . . ." (Agreement at 2, 4.) Harvest argues that it has not breached the Agreement because the Agreement gives Harvest exclusive discretion to manage the Loan and because it has administered and monitored the Loan in the same manner as other loans.

Harvest acknowledges that the Agreement requires Customers' consent before Harvest takes certain actions and concedes that it did not obtain such consent. But Harvest notes that Customers' consent "shall not be unreasonably withheld." (Agreement at 3.) Harvest interprets this clause to mean that, barring an unreasonable action, Customers' written consent is merely a formality that can be presumed. Harvest points again to the clause stating that Harvest "shall exercise the same care in accordance with its usual practices . . ." as the governing standard for determining "reasonableness." (Agreement at 4.) Because Harvest perceived itself as managing the Snug Loan in

20

the same fashion as it manages other loans, it did not perceive that any of its actions were unreasonable.

At oral argument, Customers argued that the reasonableness of its decision to grant or withhold consent is based on Customers' perspective of reasonableness, not Harvest's perspective.

There are three key provisions that the Court must construe in determining whether Harvest performed its obligations. The Court must read these provisions together because the Court must construe the Agreement in its entirety. "[A] writing is interpreted as a whole and all writings forming part of the same transaction are interpreted together." Nester v. O'Donnell, 301 N.J. Super. 198, 210 (App. Div. 1997) (quoting Barco Urban Renewal Corp. v. Housing Auth. of Atlantic City, 674 F.2d 1001, 1009 (3d Cir. 1982)).

The first key provision states:

> Except as set forth in the next sentence, [Harvest] shall have the sole and exclusive right to service, administer and monitor the Loan, including without limitation, the right to exercise all rights, privileges and options under the Loan Documents, including the waiver of non-performance by [Snug] . . . other than a waiver of any term of condition which materially and adversely affects [Customers].

(Agreement at 2 ¶ 4.) The next sentence states:

> Notwithstanding the foregoing; [Harvest] covenants and agrees that except upon the prior written consent of [Customers], which consent shall not be unreasonably withheld, [Harvest] shall not (a) make any advances to

[Snug]; (b) amend the Loan Documents or extend, modify or terminate the Loan; (c) release substitute or exchange any of the Collateral Security; (d) waive non-performance by Borrower or any guarantor of the Loan of any term or condition which materially and adversely affects the Participant; (e) enforce or refrain from enforcing its rights or remedies under the Loan Documents; (f) compromise claims by or against [Snug] . . . with respect to any collateral security; (g) consent to any increase in the maximum amount of the Loan; (h) consent to any reduction in the Interest rate or in any fees payable to [Customers] on its participation share; (i) make any intentional over-advances; or (j) extend any date for or waive any failure to make payment.

(Agreement at 2-3 ¶ 4.) The third key provision mandates that "Harvest shall exercise the same care in accordance with its usual practices in administering, servicing and monitoring the Loan as it exercises with respect to similar transactions involving no participation." (Agreement at 4 ¶ 8.)

There is a superficial tension between the general "usual practices" clause and the provisions enumerating specific matters of loan administration that obligated Harvest to give notice to Customers and to obtain its consent in ¶ 4(a)-(j), supra. "Whatever inconsistency exists between these . . . provisions is easily resolved by a well-settled rule of contract interpretation: where there is an inconsistency between a general provision and a more specific provision, the more specific provision will qualify and control the more general clause." Standard Fire Ins. Co. v. Cesario, Civ. 11-7012, 2012 WL 4194506, at *2 (D.N.J. Sept. 18, 2012); see also Bauman v.

22

Royal Indem. Co., 36 N.J. 12, 22 (1961) ("In the interpretation of a contractual instrument, the specific is customarily permitted to control the general and this ordinarily serves as a sensible aid in carrying out its intendment"); Homesite Ins. Co. v. Hindman, 413 N.J. Super. 41, 48 (App. Div. 2010) (citing "well-recognized rule of construction that when two provisions dealing with the same subject matter are present, the more specific provision controls over the more general").

In this case, there is a general provision requiring Harvest to act in accordance with its usual practices and there is a general provision giving Harvest the exclusive right to manage the Loan. But that exclusivity provision is subject to the specific provision that enumerates circumstances in which Harvest must obtain Customers' consent. The exclusivity provision specifically states "[e]xcept as set forth in the next sentence" and the next sentence begins with "[n]otwithstanding the foregoing." The next sentence then lists ten circumstances in which Harvest must obtain Customers' consent. Both the language of the Participation Agreement and the general rule of contract interpretation show that the exclusivity provision is subject to the next sentence about obtaining Customers' consent. Harvest was therefore required to obtain Customers' consent in those ten circumstances.

It is undisputed that Harvest did not obtain Customers'

23

consent at any point during its management of the Loan. It is
also undisputed that Harvest loaned Snug an additional
$575,000.00, did not impose the default rate of interest or
otherwise penalize Snug despite Snug's numerous defaults, and
issued a three-month payment waiver that extended the Loan, all
without notice and consent. The Participation Agreement requires
Harvest to obtain Customer's consent to, inter alia, "extend any
date for or waive any failure to make payment," "make any
advances to [Snug]," and "enforce or refrain from enforcing its
rights or remedies under the Loan Documents." The Court
therefore holds, as a matter of law, that Harvest did not obtain
Customers' consent in violation of the Agreement's requirements
in these specific and material ways.

Harvest argues that its failure to obtain consent is
immaterial because such consent cannot be unreasonably withheld
and none of its actions were unreasonable according to its
customary practices. This argument lacks merit. First, the
general provision about Harvest's customary practices is subject
to the specific provision, which requires Customers' consent in
specific situations. Second, it is implausible that the
reasonableness of giving consent would be determined from
Harvest's perspective. If Harvest's perspective were the only
relevant perspective, then there would be no requirement to seek
Customers' consent at all. And finally, even if Harvest's

24

failures to seek consent were immaterial, New Jersey courts have held that "even if the breach was not material, that only bears upon the quantum of damages, as even a nonmaterial breach of a contract may be compensable." Murphy v. Implicito, 392 N.J. Super. 245, 265 (App. Div. 2007).

In addition, it is undisputed that Harvest did not notify Customers of many of Snug's default events, such as overdue taxes or liens on the property. The Participation Agreement specifically required Harvest to do so and, therefore, Harvest breached. Harvest cannot cite to the provision requiring it to manage the Loan in accordance with its customary practices because there is no evidence in the record that its customary practices involve situations in which there is a participation agreement with a third-party; in other words, in its own loan portfolio, Harvest would have no "usual practice" of giving notice to itself or obtaining consent from itself.

The Court will therefore partially grant Customers' summary judgment motion on the grounds that Harvest did not perform its obligations under the Agreement, particularly the obligations to notify Customers of Snug's defaults and to obtain Customers' consent before granting a waiver, issuing Snug another loan, and refraining from imposing the default rate of interest. As discussed further infra, the Court cannot grant complete summary judgment to Customers because Customers has not established the

25

damages, if any, to which it is entitled.

### 2. Industry Standards

Plaintiff argues that Harvest breached the Agreement because it did not perform according to industry standards. This argument lacks merit.

In its briefing, Customers cited <u>Abdnor</u> to emphasize "the importance of the requirement that the bank service the loan in a commercially prudent manner." <u>Abdnor</u>, 898 F.2d at 338 (citations omitted). <u>Abdnor</u> is inapposite. The contract between the <u>Abdnor</u> parties specifically held that the bank "shall follow accepted standards of loan servicing employed by prudent lenders generally . . ." and federal regulations involving the SBA, which was a party to the contract, required lenders to "service the loan in a prudent manner." <u>Id.</u> at 336.

In this case, Customers has not identified any provision of the Agreement that requires Harvest to perform according to industry standards. The provision setting forth a standard for Harvest is the provision requiring Harvest to manage the Snug Loan in the same fashion as it manages its other loans, other than its more specific duties in the enumerated exceptions of Agreement ¶ 4(a)-(j), <u>supra</u>.

Furthermore, even if a provision requiring performance according to industry standards existed, Customers did not present any evidence of industry standards, such as expert

26

testimony or common guidelines. Therefore, Customers has not
adduced evidence such that the Court could conclude, as a matter
of law, that Harvest's actions were imprudent or outside
industry standards.

Customers is not entitled to summary judgment based on its
argument that Harvest did not follow industry standards.

**D. Damages**

**1. Customers' Motion**

Customers has not shown that there is no factual dispute
that it suffered damages resulting from Harvest's failure to
perform its obligations.

Although Customers argues that it can accelerate the Loan
and retrieve its share, the Agreement does not state that
Customers can do so. The Court "may not make a better contract
for either party, or supply terms that have not been agreed
upon." Bar on the Pier, Inc. v. Bassinder, 358 N.J. Super. 473,
480 (App. Div. 2003). Customers has not pointed to any clauses
in the Agreement stating that it has the right to accelerate the
Loan or demand its participation share back from Harvest. The
Court cannot write such terms into the Agreement. When asked
whether Harvest has an obligation to buy back or repay
Customers' share, Customers' Senior Vice President acknowledged
that "Harvest has no obligation." (Napierkowski Dep. 69:1-10.) A
reasonable factfinder could therefore conclude that the damages

Customers claims, i.e., its lost participation share, are not the result of Harvest's purported failure to perform its obligations.

Furthermore, the Agreement stipulates that Customers' participation is a "full-risk participation" and that Customers will receive only "payments received and collected by [Harvest] from [Snug] . . . for repayment of the Participation Share." (Agreement at 4.) A reasonable factfinder could find that this "full-risk" clause precludes Customers from obtaining damages, particularly the return its participation share, from Harvest.

Finally, the Court must deny Customers' motion because Customers identifies certain breaches without showing how its losses were a reasonably certain consequence of those particular breaches. In establishing damages for a breach of contract, Plaintiff must "prove, by a preponderance of the evidence, that the losses it sought to recover were a reasonably certain consequence of the breach." Totaro, Duffy, Cannova and Co., L.L.C. v. Lane, Middleton & Co., L.L.C., 191 N.J. 1, 15 (2007) (quotations omitted). Customers identifies myriad breaches, such as Harvest's failure to respond to emails or Harvest's failure to inform Customers of Snug's default events. But Customers has not shown that these breaches caused its damages. In fact, when asked whether it was "possible that Harvest could have done everything that Customers wanted and Customers wouldn't have

gotten back its full position," Customers' Senior Vice President acknowledged "[t]hat's a possibility." (Id. 76:16-19.) Essentially, Customers has not shown that it would have received its payments if Harvest had managed the Loan differently or that its losses were a reasonably certain consequence of Harvest's failure to perform its obligations.

At this procedural posture, Customers has not established the damages element of its breach of contract claim. A reasonable factfinder could conclude that: the Agreement does not entitle Customers to accelerate the Loan and retrieve its participation share; the Agreement mandates that Customers' participation is full-risk, thus precluding Customers from obtaining damages from Harvest due to Snug's failure to make payments; and Customers has not shown that its losses were a reasonably certain consequence of Harvest's breaches. The Court will therefore deny Customers' motion for summary judgment on damages.[6]

### 2. Harvest's Motion

Harvest argues that it should prevail because the Agreement mandates that Customers' participation is full-risk and that Customers is not entitled to monies that Harvest has not

---

[6] Customers also seeks attorney's fees, but it acknowledges that the Agreement does not contain an attorney's fees provision. Furthermore, Customers has not cited any legal basis for an attorney's fees award.

received from Snug. Harvest's motion must be denied because, as explained *supra*, Harvest did not obtain Customers' consent before taking certain actions. A reasonable factfinder could find that Customers would have reasonably withheld its consent, thus forcing Harvest to call the Loan, and, if Harvest had called the Loan, Customers could have recovered its participation share or some portion of it. Furthermore, Customers argues that, because Harvest failed to call the Loan, Customers has been forced to carry a defaulted loan on its books, which has also caused damages. Harvest has not adduced evidence such that the Court could conclude, as a matter of law, that Harvest's breaches did not damage Customers. Harvest's motion will be denied.

**V.   CONCLUSION**

The Court will deny Harvest's motion for summary judgment. The Court will partially grant Customers' motion for summary judgment, holding that Harvest owes Customers an unspecified amount of unpaid principal and that Harvest did not perform its obligations under the Agreement. The Court will deny Customers' motion for damages because Customers has not shown, as a matter of law, that it is entitled to damages from Harvest's breaches.

An accompanying Order will be entered.

| **August 20, 2014** | **s/ Jerome B. Simandle** |
|---|---|
| Date | JEROME B. SIMANDLE |
| | Chief U.S. District Judge |